PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JONNIE SUE HUX,
　　　　　*Plaintiff-Appellant,*

v.

CITY OF NEWPORT NEWS, VIRGINIA,
　　　　　*Defendant-Appellee.*

No. 05-1230

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Jerome B. Friedman, District Judge.
(CA-03-175)

Argued: May 25, 2006

Decided: June 23, 2006

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge King joined.

## COUNSEL

Carolyn P. Carpenter, Richmond, Virginia, for Appellant. Allen Link Jackson, Chief Deputy City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF NEWPORT NEWS, Newport News, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Plaintiff Jonnie Sue Hux contends that her employer, the City of Newport News, Virginia, failed to promote her to Fire Captain because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2000). In its defense, the City proffers evidence that it promoted male candidates over Hux because they were better qualified. Plaintiff's attempt to find pretext in this neutral explanation consists of comparing herself to individual male applicants on the basis of isolated promotional criteria, without acknowledging that those applicants' qualifications were superior to hers overall. Her suggestion that summary judgment is precluded by pinprick objections to an employer's non-discriminatory justification would place routine personnel decisions in judicial hands. We thus affirm the district court's grant of summary judgment to the City.

I.

Defendant City of Newport News operates the Newport News Fire Department, which provides, among other things, fire suppression and emergency medical services (EMS). The Fire Chief, Kenneth Jones, heads the entire Fire Department. Fire Chief Jones is directly assisted by two Deputy Fire Chiefs. Fire Captains oversee each twenty-four hour shift at the City's ten fire stations. The Fire Captain position is demanding, and involves a variety of supervisory duties both at the fire station and during emergency operations. Fire Captains, in turn, are assisted by Fire Lieutenants. Non-officer positions include Fire-fighter/Medics, who may themselves earn "Senior" status.

Plaintiff Jonnie Sue Hux commenced employment with the City of Newport News in 1986 as a dispatcher in the Emergency Communications Department. In 1990, Hux joined the Fire Department as an emergency medical technician, and in 1992, the Department assigned her to a "squad unit," a three-person team consisting of two fire-fighters and one medic. While Hux did receive basic firefighting certification as part of her squad service, her work continued to focus almost exclusively on EMS. The Department subsequently unified its fire and medical personnel, and it reclassified Hux as a Fire-

fighter/Medic in 1995. Hux was later promoted to "Senior" status even though she did not have the five years of experience that was typically a prerequisite.

In 1999, Hux applied for a Fire Lieutenant position. Anticipating that she would not receive the promotion, she filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). As it turned out, Hux was awarded the promotion, and she withdrew her EEOC charge. She was the first woman in the Department appointed to a fire officer position. Unfortunately, however, major surgery required Hux to take almost 2000 hours of sick leave during the period between her promotion and September 2003. While the Department permitted her this leave, being so often away from work naturally limited her amount of experience as a Fire Lieutenant.

Hux's tenure as Fire Lieutenant was characterized by continuous friction with her subordinates and fellow officers. In October 2001, for example, ten male and female subordinates at Hux's fire station wrote a joint letter to Hux's superiors, complaining that Hux fostered "antagonistic work conditions" and exemplified "autocratic management." According to the letter, Hux "single[d] out subordinates, on an ongoing basis, to humiliate and frustrate them," and was "intentionally defiant and openly critical" of their Captain. For her part, Hux contends that her Fire Captain was generally unsupportive, and that her subordinates were rude and unwilling to follow her orders because she was a female.

On October 11, 2001, the Department transferred Hux to a different fire station, but the discord followed her to the new location. While Hux suggests things improved, her new Captain informed Fire Chief Jones that Hux's interpersonal interactions were not of "the proper tone to foster . . . unit cohesiveness." In 2003, Hux received a standard pay increase, but a Battalion Chief noted on her employment evaluation that he had spoken with her about her negative attitude and had asked her to improve. Hux contends that this same Battalion Chief was disrespectful to her and made it difficult for her to do her job.

Hux's problems were not, however, related solely to personality differences, as the record reveals numerous instances of unprofes-

sional behavior. For example, Hux called a subordinate a "stupid mother fucker" in front of the rest of her firehouse crew following an incident in which a fire hose was packed improperly. This resulted in a formal counseling from Fire Chief Jones. In addition, and in the presence of the Fire Administration staff, Hux insulted a Fire Captain by proclaiming that he had earned his promotion by "using knee pads." Other examples include intentionally hanging up on a call to her fire station, and, in front of others, openly chastising her Fire Captain as a "wuss" after he decided there had been enough training for one day. Hux did not deny these allegations in the court below, and they unfortunately represent only a sampling of the various improprieties found in the record.

Despite this bumpy tenure as Fire Lieutenant, Hux continued to seek advancement within the Department. Once she had met the threshold eligibility requirements, including a minimum of two years service as a Fire Lieutenant, Hux applied for a promotion to Fire Captain on four separate occasions: February 2002,[1] December 2002, September 2003, and January 2004, the last a reconvening of the September 2003 process. Combined, these four promotion periods filled nineteen Fire Captain vacancies. Hux was never selected, and all of the promotions went to male applicants. Hux was the only female candidate considered in each of the promotion periods because she was the only woman who met the threshold eligibility requirement of two years service as a Fire Lieutenant.

Hux filed multiple administrative charges with both the EEOC and the City alleging gender discrimination in the Department's failure to promote her to Fire Captain. After exhausting her administrative remedies, Hux commenced this lawsuit, contending that the Department failed to promote her because of her gender, and in retaliation for her filing administrative charges. The district court granted summary judgment to the City. Hux appeals.

II.

Title VII makes it unlawful for an employer to discriminate against

---

[1]Hux does not challenge the February 2002 promotional process here.

an individual because of that individual's sex. *See* 42 U.S.C. § 2000e-2(a)(1). Hux acknowledges that she can proffer no direct evidence of discrimination, and so elects to proceed under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See, e.g.*, *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). Plaintiff first must make out a prima facie case of discrimination, *see McDonnell Douglas Corp.*, 411 U.S. at 802, and we will assume that Hux has done so here. The burden then shifts to the City to give a legitimate, non-discriminatory justification for its decision. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The City has met this burden by providing evidence that it did not promote Hux to Fire Captain because male candidates were better qualified. *See, e.g.*, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). As a result, Hux must show that this proffered explanation is pretext for intentional discrimination. *See Reeves*, 530 U.S. at 142-43. "A plaintiff alleging a failure to promote can prove pretext by showing that [she] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006).

The general standards for summary judgment naturally inform any assessment of whether a plaintiff has provided sufficient evidence of pretext such that her case may proceed to trial. *See, e.g.*, *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005); *Mereish v. Walker*, 359 F.3d 330, 339 (4th Cir. 2004). As the Supreme Court has made clear, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Reeves*, 530 U.S. at 148 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Together, the genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The summary judgment standards mesh comfortably with the *McDonnell Douglas* framework. Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot

seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a "genuine" dispute, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986), the latter would fail to be "material," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And it thus follows that in a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination. *See Anderson*, 406 F.3d at 271 (plaintiff "cannot establish pretext by relying on criteria of her choosing when the employer based its decision on other grounds"); *see also Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005).

Brushing aside the materiality and genuineness components of summary judgment in these cases would in due course substitute courts for employers as the decisionmakers of last resort in personnel matters, *see Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995). Duty-bound though we are to examine employment decisions for unlawful discrimination, we are not cloaked with the authority to strip employers of their basic business responsibilities. *See Anderson*, 406 F.3d at 269; *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998). The obligation of courts to enforce the essential mandate of anti-discrimination law coexists with the duty not to invade the province of another in circumstances which the law does not allow. The summary judgment standards, as applied to the familiar *McDonnell Douglas* framework, are designed to respect the balance.

With these principles in place, we turn to the record before us.

### III.

The Fire Department conducts the promotional process for Fire Captain positions on an as-needed basis, and all candidates are interviewed by a panel usually comprised of the Fire Chief and two Deputy Fire Chiefs. Pursuant to Department policy, each member of the interviewing panel typically ranks the candidates based on the various

factors that the Department considers relevant, such as interview performance, years in fire service, Fire Lieutenant tenure, disciplinary record, overall job performance, and use of leave time. Once each interviewer has ranked the applicants, the three-member panel meets to discuss them. The Fire Chief makes all final decisions. Hux raises challenges to three promotional processes: December 2002, September 2003, and January 2004.

A.

In December 2002, the Fire Department interviewed seventeen candidates for six Fire Captain vacancies, and selected six men. Every member of the three-person interviewing panel ranked each of the six successful male candidates above Hux. Of those six, all had at least eighteen years of fire service experience, and one, in fact, had twenty-nine years of experience. Hux, by contrast, had worked in fire service for only seven years. While it is not incumbent on employers to adopt a promotion scheme based on seniority, it is certainly permissible for them to take seniority and experience into account. In addition to fire service experience, five of the six successful candidates had served as Fire Lieutenants for at least five years, including one who had served as a Lieutenant for thirteen years. By this point, Hux had only served as a Fire Lieutenant for approximately three years. The one successful candidate who had a slightly shorter Lieutenant tenure than Hux had other qualifications that she did not possess, including more fire service experience, superior employment evaluations, and minimal use of leave time. Fire Chief Jones ranked him the top candidate, whereas the highest any interviewer ranked Hux was fourteenth.

The Department also expressed concern that Hux did not possess the ideal personality traits for a Fire Captain. Fire Chief Jones indicated that Hux "had problems exercising leadership" and was not promoted because "of her need to improve her interpersonal communication skills." In addition, Hux became emotional towards the end of her interview. As she explains, "her voice cracked and tears welled up in her eyes." This was important to the interviewing panel, which worried that Hux might not possess the composure required to coordinate a team charged with protecting lives and property under highly stressful situations.

In the September 2003 promotional process, twelve candidates applied for five Fire Captain openings, and the Department promoted five men. Every interviewer ranked every successful candidate higher than Hux, and one interviewer in fact ranked Hux last. In addition, every successful applicant had at least thirteen years of fire service experience; Hux had eight. Three of the five, moreover, had served as Fire Lieutenants for almost twice as long as Hux. The two successful candidates with slightly less experience as Fire Lieutenants both had more total fire service experience than Hux, had used considerably less leave time, and had more favorable performance evaluations. Finally, the City contends that Hux did not perform well in her interview, and there were once again concerns about her interpersonal and leadership skills.

The final promotional process took place in January 2004, and three men received promotions. As before, all had significantly more fire service experience than Hux. While two successful candidates had served as Fire Lieutenants for six months less than Hux, both had worked at least six more years in fire service, were ranked higher by every interviewer, had employment evaluations that were equal to or exceeded Hux's, and had used less than ten percent of the leave time she had used. Similarly, while two interviewers did rank the third successful candidate below Hux, this candidate had over twenty years of fire service experience, had served as a Lieutenant for more than three times as long as Hux, possessed superior evaluations, and had taken less than half of the leave time that Hux had.

### B.

Notwithstanding the foregoing, Hux argues that the City's contention that male candidates were more qualified is pretext for unlawful discrimination. In doing so, however, she would ask this court to miss the forest for the trees, and disregard the better overall qualifications of her fellow applicants. In Hux's view, it is sufficient to compare herself to those individuals who received promotions on the basis of the only factor in which she was arguably equal to each one, a factor which changes with every comparison. This does not satisfy her burden in this case. A plaintiff cannot create a triable issue by selecting from the many criteria used in the promotions process the one factor on which he or she may conceivably compare. "By its very terms,

[Rule 56] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. As we shall explain, Hux's arguments fall prey to this important limitation.

First, Hux argues that the City's reliance on her performance problems, particularly her poor interpersonal and supervisory skills, is a cover for gender discrimination because three successful male candidates also had performance issues. Hux points out that one, for example, was formally counseled for an incident in which he yelled at a co-worker and locked a medic unit's brakes. Another was once cited for conversing with a fellow employee and listening to a football game during a rescue operation.

These incidents involving other personnel are not indicative of pretext. To begin with, they involve isolated episodes that do not compare to Hux's own chronic problems with personal interactions, problems that were so severe that her subordinates took the unusual measure of writing a joint letter to her superiors. This letter stated, among other things, that Hux "unreservedly demeans and chastises the actions of subordinates on a regular and ongoing basis" and that she was "discourteous and holds no respect for any member of [the] team."

In addition, each of the three candidates with whom Hux compares herself was significantly more qualified by almost every other metric the Department considered. One, for instance, had approximately three times as much fire service experience, a significantly longer Fire Lieutenant tenure, and also enjoyed better overall evaluations. To find pretext in the City's explanation on the basis of these three candidates' sporadic performance problems would, in short, require us to elevate a single consideration — which does not, in any event, cut in plaintiff's favor — above all others the Department found relevant. *See Anderson*, 406 F.3d at 270 (plaintiff "may not choose the areas in which she wants to compete . . . for the promotion").

Hux alternatively asks that we ignore the ample evidence of her difficulties working amicably with others. To the extent that Hux contends that supervisory and communication skills are actually not rele-

vant job qualifications, we must disagree, for an employer can "properly take into account" factors such as "good interpersonal skills and . . . ability to lead a team." *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995). It is not within our authority to dictate the factors that employers must weigh in making a promotion, and we see nothing in Title VII to indicate that Congress wished to require companies to disregard the successful personal interactions that make for a productive workplace. This is especially true where, as here, the employer is charged with protecting the public in serious emergencies and the plaintiff has experienced problems acting professionally at work. And while Hux attempts vaguely to pin her various misadventures on her fellow employees' unwillingness to cooperate with a female, this argument is, as the district court noted, based on Hux's "own conclusory opinion and rumor alone."

Second, Hux attempts to discern pretext in the City's reliance on the fact that she had fewer years of fire service experience than successful male candidates. To this end, she focuses her attention on a single successful candidate, Adrian Hanline. Hux and Hanline both served for a period on "squad units," small teams comprised of firefighters and medics that were eventually phased out in 1995. Hux contends that her three years of squad service should count towards her total fire service experience, as Hanline's approximately six years apparently did towards his. Hux, however, served on a squad unit at a time when its primary responsibilities pertained to EMS — in fact, as the district court explained, "90-95% of her work on the squad continued to focus exclusively on providing emergency medical services, rather than fire suppression." Hanline, by comparison, began serving on a squad at an earlier point, when it was still heavily involved in firefighting. Hanline was also promoted during the February 2002 process, which Hux does not even challenge here.

Hux further suggests that most of the calls a fire station receives are EMS-related, and that any reliance on fire suppression experience thus lacks credence. This argument must fail, for Hux essentially asks that we determine whether a Fire Department should be more concerned with firefighting or EMS. Beginning down this road — with courts acting as strategists that identify the core objectives an employer should pursue — would bring promotions decisions under the greenhorn supervision of the federal courts.

Third, Hux argues that the City's reliance on her leave time usage is pretextual because a successful candidate in the December 2002 process, John Grimsley, had also taken a similarly large amount of leave due to a major accident. This argument suffers from the same infirmity as those addressed above, because Grimsley was more qualified than Hux in almost every respect. As of December 2002, Hux had seven years of fire service experience, approximately three as a Fire Lieutenant. Grimsley, by contrast, had twenty-six years of firefighting experience, thirteen as a Fire Lieutenant. Grimsley also had far superior employment evaluations, and Fire Chief Jones determined that he gave the best interview performance of any candidate. Grimsley's leave time, like the other objections Hux raises, fails to undermine the City's contention that Hux was less qualified overall for a Fire Captain position.

Finally, Hux contests the City's citation of her emotional performance in her December 2002 interview, which the City suggests called into question Hux's level-headedness in emergency situations. Hux explains that her emotions may have gotten out of check in her December 2002 interview because she had heard rumors that she might be appointed to an office captaincy rather than a field position. She further notes that she had worked in tense situations before, occasionally as an Acting Captain. Both of these assertions do not, however, take away from the fact that as Hux acknowledges, she became visibly upset during her interview, and "it is the perception of the decision maker which is relevant." *DeJarnette*, 133 F.3d at 299 (internal quotation marks and alterations omitted). Interviews are an important tool that employers use to make all sorts of hiring decisions, and we may not lightly overturn the reasonable conclusions an employer reaches after actually meeting with a candidate face-to-face.[2]

---

[2]Hux raises various other allegations of pretext, which we have reviewed and find to be without merit. She also contends that she can prove discrimination under the mixed-motive approach. *See* 42 U.S.C. § 2000e-2(m); *Diamond*, 416 F.3d at 317. Hux did not properly raise this theory below and the district court expressly refused to consider it. But even if Hux had diligently pursued this argument, we conclude for the reasons given above that it would not assist her here.

Finally, Hux alternatively contends that the Department denied her a promotion in later rounds of the process in retaliation for her filings with

IV.

We are sensitive to the fact that Hux was one of the first females to seek advancement in a Fire Department populated predominately by men. We certainly agree that firefighting skills are not confined to a single gender. But this proposition does not mean that the decisions in this case were improperly motivated or driven by anything other than the needs of Newport News for an effective firefighting service. In enacting Title VII, Congress sought to eliminate unlawful discrimination in the employment setting, but it did not endeavor to force employers to undergo the burdens of trial whenever a plaintiff proffered simply *any* response to an employer's non-discriminatory justifications. The City has offered overwhelming evidence that the successful candidates presented stronger credentials for the position plaintiff sought. In making and defending its decision, the City was entitled to focus on the applicants' qualifications taken as a whole — a judgment not rendered pretextual by the fact that one among many factors is allegedly in dispute. To preclude summary judgment here would diminish the place of qualifications in promotions decisions. The judgment of the district court is therefore

*AFFIRMED*.

---

both the City and the EEOC, which alleged discrimination in earlier rounds of Fire Captain hiring. We have explained in detail, however, that both the earlier and later decisions were based on legitimate considerations which reflected neither discrimination or retaliation in the employment context.